1    Sharon T. Hritz (265105)
     Email: shritz@kellerrohrback.com
2    KELLER ROHRBACK L.L.P.
     1129 State Street, Suite 8
3    Santa Barbara, CA 93101
     Tel: (805) 456-1496 / Fax: (805) 456-1497
4

5    Lynn Lincoln Sarko
     Email: lsarko@kellerrohrback.com
6    Michael D. Woerner
     Email: mwoerner@kellerrohrback.com
7    Tana Lin
     Email: tlin@kellerrohrback.com
8    Laura R. Gerber
     Email: lgerber@kellerrohrback.com
9    KELLER ROHRBACK L.L.P.
     1201 Third Avenue, Suite 3200
10   Seattle, WA 98101
     Tel: (206) 623-1900 / Fax: (206) 623-3384
11

12 *Attorneys for Plaintiff*
13 [Additional Counsel Listed on Signature Page]



14

UNITED STATES DISTRICT COURT

15

NORTHERN DISTRICT OF CALIFORNIA

AT SAN FRANCISCO

16

17   EDWIN L. RESO, for the use and benefit of    )    CASE NO. **CV 11 3137**

18   THE ARTISAN INTERNATIONAL FUND,     )
   THE ARTISAN INTERNATIONAL VALUE     )    **COMPLAINT**
   FUND, and THE ARTISAN MID CAP       )

19   VALUE FUND,                           )    **DEMAND FOR JURY TRIAL**
                      Plaintiff,   )

20                                 )

21      v.                             )
                                )

22   ARTISAN PARTNERS LIMITED        )
   PARTNERSHIP,                  )

23                       Defendant.   )

24

25       Edwin L. Reso ("Plaintiff") brings this action on behalf of and for the benefit of the

26   Artisan International Fund, the Artisan International Value Fund, and the Artisan Mid Cap Value

27

28

COMPLAINT - 1

Fund (collectively, "Artisan Funds" or "Funds"), and sues Artisan Partners Limited Partnership ("APLP" or "Defendant"). Plaintiff seeks to rescind the investment advisory agreements between Defendant and the Artisan Funds and to recover the total fees charged by Defendant pursuant to the agreements or, alternatively, to recover any improper compensation received by Defendant in breach of its statutory fiduciary duty under § 36(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. § 80a-35(b). The conduct complained of herein is continuing in nature, and Plaintiff seeks recovery from the earliest possible period allowed by the applicable statute of limitations through the date of final judgment after trial. In support of this Complaint, Plaintiff alleges:

## I.   JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

2.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391, as the Defendant inhabits or transacts business in this district, a substantial part of the events or omissions that give rise to Plaintiff's claims occurred in this district, and Defendant may be found in this district.

3.     No pre-suit demand on the board of directors of the Funds is required as the demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions or counts brought under § 36(b) of the ICA. *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984).

4.     All conditions precedent have been performed or have been satisfied or waived.

COMPLAINT - 2

## II.   PARTIES

5.      Plaintiff Edwin L. Reso is a resident of Louisiana and owns shares in each of the Artisan Funds. Each of the Funds is a separate series of Artisan Funds, Inc.,[1] an open-end, diversified management investment company incorporated under Wisconsin law and registered under the ICA, 15 U.S.C. § 80a-1, et seq.

6.      Defendant APLP is a Delaware limited partnership and is registered as an investment adviser under the Investment Advisers Act of 1940. APLP was founded in March 2009 and succeeded to the investment management business of Artisan Partners Holdings LP. APLP is the investment adviser for each of the Funds. APLP maintains offices in various locations, including San Francisco, California. Two of the three Funds that are the subject of this Complaint are managed out of APLP's offices in San Francisco.

## III.   NATURE OF THE ACTION

7.      This action is brought by the Plaintiff for the benefit of and on behalf of the Artisan Funds pursuant to ICA § 36(b).

8.      APLP provides investment advisory services to each of the Funds for compensation pursuant to Investment Advisory Agreements. In addition to the Funds, APLP and/or its affiliates provide investment advisory services to other mutual funds, unregistered funds, and separate accounts.

9.      Defendant has breached its fiduciary duty to the Artisan Funds, in violation of § 36(b) of the ICA, with respect to the investment advisory compensation it receives from the Funds. Defendant's breach of fiduciary duty is demonstrated by, *inter alia*: (a) the nature and quality of services provided to the Funds and their shareholders in exchange for the investment

---

[1] Effective July 1, 2011, Artisan Funds, Inc. is changing its name to Artisan Partners Funds, Inc.

COMPLAINT - 3

advisory fees; (b) the failure of the Funds' board of directors to exercise the requisite level of care and conscientiousness in approving the investment advisory agreements; (c) the failure of Defendant to provide the Funds' board of directors with all information reasonably necessary to evaluate the terms of the investment advisory agreements with respect to each of the Funds; (d) the level of the fees as compared to those charged by Defendant or its affiliates to other accounts, including non-mutual fund customers; (e) the fees other mutual fund advisers charge for similar services to similar mutual funds; (f) the failure of Defendant to adequately pass economies-of-scale savings on to the Funds and their shareholders, and the retention of those economies-of-scale savings by Defendant; and (g) Defendant's costs and high profitability associated with providing investment management services to the Funds.

10. The allegations in this Complaint are predicated on publicly available information, including information contained in the public filings with the Securities and Exchange, and on information and belief after a reasonable investigation.

## IV.   THE PURPOSE OF SECTION 36(b)

11. Section 36(b) imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation. Congress recognized as early as 1935 that because "a typical [mutual] fund is organized by its investment advisor which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the advisor." S. Rep. No. 91-184, p. 5 (1969). Therefore, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Id.* As a result in 1940, Congress enacted the ICA recognizing that:

> The national public interest and the interest of investors are adversely affected . . .
> when investment companies are organized, operated [and] managed . . . in the

COMPLAINT - 4

> interest of . . . investment advisers . . . rather than in the interest of [shareholders] .
> . . or when the investment companies . . . are not subjected to adequate
> independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994). Accordingly, the ICA was designed to regulate and

curb "abuses inherent in the structure of [the mutual fund industry]," *Jones v. Harris Associates*

*L.P.*, 130 S.Ct. 1418, 1422 (2010) (quoting *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536

(1984)), and to create standards of care applicable to investment advisers and their affiliates,

such as Defendant.

12. The Artisan fund complex, like almost all other mutual fund complexes, operates

under a single structure consisting of a group of related investment companies (the mutual funds

themselves) that are owned by their shareholders and governed by a board of directors.

However, the mutual funds themselves are basically corporate shells in that they have few or no

employees. Instead, the mutual funds contract for all of the services they need — including

distribution of their securities, custodianship of their assets, auditing, servicing shareholder

accounts, portfolio management, and day-to-day administration — all of which are provided by

or arranged for by Defendant and/or its affiliates. For this very reason, "the relationship between

investment advisers and mutual funds is fraught with potential conflicts of interest," *Burks v.*

*Lasker*, 441 U.S. 471, 481 (1979), and "potentially incestuous." *Gartenberg v. Merrill Lynch*

*Asset Management, Inc.*, 694 F.2d 923, 929 (2d Cir. 1982).

13. The Artisan Funds are governed by a unitary board of directors ("Artisan Board"

or "Board"), including both "independent" directors and interested directors.[2] These same

---

[2] "Independent board members are those who are not "interested persons" as defined under the
1940 Act. *See* 15 U.S.C. § 80a-2(a).

COMPLAINT - 5

individuals, including all independent board members, simultaneously oversee all of the mutual

funds in the Artisan fund complex.

14.     While mutual fund boards are supposed to be the "watchdogs" for the

shareholders of the funds, two noteworthy industry insiders have commented on the general

failure of mutual fund boards to fulfill their responsibilities under the ICA.

15.     Jack Bogle, founder of the Vanguard Group, made the following comment:

> Well, fund directors are, or at least to a very major extent, sort of a bad joke.
> They've watched industry fees go up year after year, they've added 12b-1 fees. I
> think they've forgotten, maybe they've never been told, that the law, the
> Investment Company Act, says they're required to put the interest of the fund
> shareholders ahead of the interest of the fund adviser. It's simply impossible for
> me to see how they could have ever measured up to that mandate, or are
> measuring up to it.

John C. Bogle, *Common Sense on Mutual Funds: New Imperatives for the Intelligent Investor*

(2000).

16.     Warren Buffet, famous investor and chairman of Berkshire Hathaway, made the

following comment, which was quoted by a United States District Court:

> I think independent directors have been anything but independent.  The
> Investment Company Act, in 1940, made these provisions for independent
> directors on the theory that they would be the watchdogs for all these people
> pooling their money.  The behavior of independent directors in aggregate since
> 1940 has been to rubber stamp every deal that's come along from management –
> whether management was good, bad, or indifferent.  Not negotiate for fee
> reductions and so on.  A long time ago, an attorney said that in selecting directors,
> the management companies were looking for Cocker Spaniels and not
> Dobermans.  I'd say they found a lot of Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F. Supp. 2d 373, 383 (S.D.N.Y. 2002) (citation omitted).

17.     Mr. Buffet also stated, in his letter to shareholders in the 2002 Berkshire

Hathaway, Inc. annual report:

> [A] monkey will type out a Shakespeare play before an "independent" mutual-
> fund director will suggest that his fund look at other managers, even if the

COMPLAINT - 6

incumbent manager has persistently delivered substandard performance. When they are handling their own money . . . directors will look to alternative advisors – but it never enters their minds to do so when they are acting as fiduciaries for others . . . Investment company directors have failed as well in negotiating management fees . . . If you or I were empowered, I can assure you that we could easily negotiate materially lower management fees with the incumbent managers of most mutual funds. And, believe me, if directors were promised a portion of any fee savings they realized, the skies would be filled with falling fees. Under the current system, though, reductions mean nothing to "independent" directors while meaning everything to managers. So guess who wins? . . . [I]n stepping up to [their] all-important responsibilities, tens of thousands of "independent" directors, over more than six decades, have failed miserably. (They've succeeded, however, in taking care of themselves; their fees from serving on multiple boards of a single "family" of funds often run well into six figures.)

2002 Berkshire Hathaway, Inc. Annual Report to Shareholders, p. 17 – 18.

18.     Judge Richard Posner has recognized the "feeble incentive of boards of directors to police compensation," *Jones v. Harris Associates L.P.*, 537 F.3d 728, 730 (7th Cir. 2008) (collecting sources), citing a study finding "'evidence that connections among agents in [the mutual fund industry] foster favoritism, to the detriment of investors'" and noting that "'[w]hen directors and the management are more connected, advisors capture more rents and are monitored by the board less intensely,'" *id.* at 730-31 (quoting Camelia M. Kuhnen, "Social Networks, Corporate Governance and Contracting in the Mutual Fund Industry" (Mar. 1, 2007), http://ssrn.com/abstract=849705 (visited July 28, 2008).

19.     These statements exemplify the concern raised in the preamble to the ICA that "investment companies are organized, operated and managed in the interest of investment advisers, rather than in the interest of shareholders."

20.     In the late 1960s, it became clear to Congress that investment advisers to mutual funds were gouging those funds with unreasonable and excessive fees, particularly by not taking economies of scale into account when setting fees to charge investors. As a result, § 36(b) was added to the ICA in 1970, which created a federal cause of action for breach of fiduciary duty.

COMPLAINT - 7

21.     Section 36(b) also created a judicial remedy for breach of such fiduciary duty by authorizing litigation against investment advisers, their affiliates, and certain others by the Securities and Exchange Commission ("SEC" or the "Commission") or by a security holder on behalf of the investment company with respect to payments made to such entities or persons by the investment company or by its security holders.  Section 36(b) states, in pertinent part:

> Sec. 36(b).  For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in the respect of such compensation or payments paid by such registered investment company or the security holders thereof to such investment adviser or person.  With respect to any such action, the following provisions shall apply:

> (1) It shall not be necessary to prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.

> (2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company shall be given such consideration by the court as is deemed appropriate under all the circumstances.

15 U.S.C. Sec. 80a-35(b).

22.     Congress enacted § 36(b) to provide shareholders with a means to redress breaches of the adviser's fiduciary duty to the funds it manages and distributes.  1970 U.S.C.C.A.N. at 4898.  Congress chose not to rely simply on a fund's directors to prevent

COMPLAINT - 8

excessive fees and other abuses.  Rather, Congress intended security holder legal actions under §

36(b) to act as independent checks on an adviser's fulfillment of its fiduciary duties.

23.     Furthermore, while on a shareholder-by-shareholder basis, the fees charged and

received by Defendant may appear to be very small, they cause a dramatic decrease in a

shareholder's investment returns over time.  Arthur Levitt, past Chairman of the SEC, was

critical of what he called the "tyranny of compounding high costs:"

> Instinct tells me that many investors would be shocked to know how seemingly
> small fees can over time, create such drastic erosion in returns . . . In the years
> ahead, what will mutual fund investors say if they realize too late their returns
> have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., *Inaugural Address: Costs Paid with Other People's Money, Address at

Fordham University School of Law* (Nov. 3, 2000), 6 Fordham J. Corp. & Fin. L. 261, 259, 267

(2001).

24.     For example, assume that an employee with 35 years until retirement has a current

401(k) account balance of $25,000.  If returns on investments in their account over the next 35

years average 7 percent, and fees and expenses reduce their average returns by 0.5 percent, their

account balance would grow to $227,000 at retirement, even if there were no further

contributions to their account.  However, if fees and expenses being withheld are 1.5 percent,

their account balance would grow to only $163,000 at retirement.  The 1 percent difference in

fees and expenses reduces their account balance at retirement by a shocking **28 percent**.

COMPLAINT - 9



*See* Department of Labor Publication "A Look at 401(k) Plan Fees," available at

*http://www.dol.gov/ebsa/publications/401k_employee.html.*

25.     Section 36(b) itself does not set forth a list of factors to be considered in

determining whether an investment adviser, such as Defendant, has breached its fiduciary duty

with respect to its receipt of compensation for services paid by a mutual fund such as any of the

Artisan Funds. "Fiduciary duty" is a well-established legal concept that entails duties of good

faith, loyalty, and due care. A fiduciary must act primarily in the best interests of the client. *See*

Restatement of Trusts (Third) § 170. A breach of fiduciary duty occurs "when a fiduciary

permits an unreasonable or excessive fee to be levied on the fund," 1969 Hearings at 189, or

"when compensation to the adviser for his services is excessive, in view of the services rendered

— where the fund pays what is an unfair fee under the circumstances. *Id.* at 190. In the case of

fees that involve a conflict of interest, such as here, this standard requires both fair dealing and a

fair price. Thus, under general fiduciary law, a fee that is not the result of a fair process, or that

is not reasonable, is a breach of fiduciary duty.

COMPLAINT - 10

26.      In *Pepper v. Litton*, 308 U.S. 295 (1939), former SEC Chairman Justice Douglas

further explained the fiduciary duty standard, as he opined that fiduciaries'

> dealings with the corporation are subjected to rigorous scrutiny and where any of
> their contracts or engagements with the corporation is challenged the burden is on
> the [fiduciary] not only to prove the good faith of the transaction but also to show
> its inherent fairness from the viewpoint of the corporation and those interested
> therein. *The essence of the test is whether or not under all the circumstances the
> transaction carries the earmarks of an arm's length bargain.  If it does not, equity
> will set it aside* . . . He who is in such a fiduciary position cannot serve himself
> first and his cestuis second . . . He cannot use his power for his personal
> advantage and to the detriment of the stockholders and creditors no matter how
> absolute in terms that power may be and no matter how meticulous he is to satisfy
> technical requirements.  For that power is at all times subject to the equitable
> limitation that it may not be exercised for the aggrandizement, preference, or
> advantage of the fiduciary to the exclusion or detriment of the cestuis.  Where
> there is a violation of those principles, equity will undo the wrong or intervene to
> prevent its consummation.

*Pepper*, 308 U.S. at 306-311 (emphasis added).  In *Jones*, the United States Supreme Court held

the formulation of the concept of fiduciary duty stated in *Pepper* "expresses the meaning of the

phrase 'fiduciary duty' in § 36(b) . . . ." 130 S.Ct. at 1427.  Thus, by adopting *Pepper*, the

Supreme Court adopted a fiduciary duty standard for § 36(b) that requires both good faith in the

negotiation process and a fair outcome.

27.      The Delaware Supreme Court has admonished independent directors to bargain

hard in order to insure that the best possible bargain is struck on their corporation's behalf:

> The power to say no is a significant power.  It is the duty of the directors serving
> on [an independent committee] to approve **only** a transaction that is in the best
> interests of the public shareholders, to **say no to any transaction that is not fair
> to those shareholders and is not the best transaction available**.

*Kahn v. Lynch Commc'ns, Inc.*, 638 A.2d 1110, 1119 (Del. 1994) (emphasis supplied) (brackets

in original), *quoting In re First Boston. Inc. S'holder Litig.*, Civ. A. No. 10338, 1990 WL 78836,

at *15-16 (Del. Ch. June 7, 1990).

COMPLAINT - 11

## V.   FACTORS GENERALLY RELEVANT TO A SECTION 36(b) CLAIMS

28.   The Supreme Court also made clear that "a court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance." *Jones*, 130 S.Ct. at 1429.  In the context of § 36(b) litigation, courts have historically considered, *inter alia*, the following factors:

- the nature and quality of services being paid for by the fund and its investors;

- whether the directors exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements;

- what fees are charged by the adviser to its other non-mutual fund customers, if any;

- what fees other mutual fund complexes or funds within the same fund family charge for similar services to similar mutual funds;

- whether economies of scale were passed to the funds and their investors or kept by the investment adviser; and

- the costs of providing those services and the profitability of providing the services.

29.   With respect to comparative fee information, the Supreme Court has cautioned courts "not [to] rely too heavily on comparisons with fees charged to mutual funds by other advisers." *Jones*, 130 S.Ct. at 1429.  The Court explained that such comparisons "are problematic because [the fees charged to other similar funds], like those challenged, may not be the product of negotiations conducted at arm's length." *Id.*

30.   As set forth below, an examination of these factors demonstrates that the fees charged to the Artisan Funds and their investors breach APLP's fiduciary duty to the Funds with respect to such compensation.

COMPLAINT - 12

## A.    NATURE AND QUALITY OF SERVICES

31.    The Investment Advisory Agreements between APLP and the Artisan Funds provide that APLP shall manage the investment and reinvestment of the assets of the Funds subject to the supervision of the Funds' board of directors. *See, e.g.*, Artisan Funds, Inc., Investment Advisory Agreement, Dec. 28, 1995 (as amended Nov. 17, 2005).[3]

32.    For these services, each of the Funds pays APLP a fee based on a percentage of the Fund's assets. The investment advisory fees are not based on the services actually rendered or APLP's actual costs in providing services to the Funds.

33.    The assets of each of the Funds as of June 15, 2011,[4] and APLP's fee schedule for each of the Funds are as follows:

| Fund | Assets | Annual Fee Rate |
|------|--------|-----------------|
| International Fund | $7.6 billion | 1.000% on assets up to $500 million<br>0.975% on assets of $500 million up to $750 million<br>0.950% on assets of $750 million up to $1 billion<br>0.925% on assets of $1 billion up to $12 billion<br>0.900% on assets over $12 billion |
| International Value Fund | $4.0 billion | 1.000% on assets up to $500 million<br>0.975% on assets $500 million up to $750 million<br>0.950% on assets $750 million up to $1 billion<br>0.925% on assets over $1 billion |
| Mid Cap Value Fund | $7.4 billion | 1.000% on assets up to $500 million<br>0.975% on assets $500 million up to $750 million<br>0.950% on assets $750 million up to $1 billion<br>0.925% on assets over $1 billion |

34.    Under the terms of the Investment Advisory Agreements, Defendant furnishes office space, equipment, and personnel to manage the business of the Funds and assumes expenses incurred in managing the funds. However, the Funds contract with and pay fees to third-parties for various other services, including custodial services, transfer agency services,

---

[3] Available at http://www.faqs.org/sec-filings/110517/Artisan-Partners-Asset-Management-Inc_S-1.A/dex1013.htm.

[4] Asset data from Morningstar (www.morningstar.com).

COMPLAINT - 13

legal services, and accounting services.  The Funds also pay the fees and expenses of the board

of directors, the costs of shareholder communications, registration fees, and broker commissions

and other expenses associated with the purchase and sale of portfolio securities for the Funds.

35.     To the extent Defendant provides services other than portfolio management

services pursuant to the Investment Advisory Agreements, such services are, on information and

belief, de minimis and/or do not entail significant costs to Defendant.  *See* John P. Freeman,

Stewart L. Brown and Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair*

*Fiduciary Test*, 61 Okla. L. Rev. 83, 113 (2008), available at

http://law.sc.edu/faculty/freeman/2008-mutual_funds.pdf.

36.     Morningstar, a noted industry analyst, has recognized the excessiveness of the

Artisan International Fund's advisory fee.  Morningstar assigns Stewardship Grades to mutual

funds from A (best) to F (worst) for various aspects of a fund's management, including

regulatory issues, board quality, manager incentives, fees, and corporate culture.  For its fees,

Morningstar has assigned the Fund a grade of F.

37.     In light of the factors discussed below, the investment advisory fees APLP

charges the Funds are disproportionate to the services rendered for those fees and could not have

been the result of an arm's-length negotiation.

**B.      LEVEL OF CARE AND CONSCIENTIOUSNESS OF THE FUNDS' DIRECTORS**
**         IN APPROVING THE INVESTMENT ADVISORY AGREEMENTS**

38.     In *Jones*, the Supreme Court adopted a fiduciary duty standard for § 36(b) that

requires *both* a fair outcome *and* good faith in the negotiation process.  As discussed below,

Defendant failed to provide the Funds' directors with all necessary information, and the directors

did not (and, indeed, could not) act with sufficient care and conscientiousness in reviewing and

COMPLAINT - 14

approving the advisory fees. As a result, the fee-setting process lacked the requisite integrity and good faith in violation of § 36(b).

39.     Fund directors have a fiduciary duty to mutual funds and to their shareholders (who individually have no power to negotiate such fees for the funds) to negotiate fees that are both beneficial to the mutual funds and are comparable to fees that would be negotiated at arm's-length.

40.     The Artisan Board has a separate and distinct fiduciary duty to each Artisan Fund, to enter into serious and substantive negotiations with respect to the fees charged by APLP. *See* Am. Bar. Ass'n. Fund Director's Guidebook (2d ed. 2003) at 10 ("Although there are areas of common interest among fund, the directors must exercise their specific board responsibilities on a fund-by-fund basis."). Correspondingly, APLP has a reciprocal fiduciary duty to each mutual fund under its management to assure that the fees it charges for services rendered are reasonably related to the services provided and correspond with fees that would be charged in an arm's-length negotiation.

41.     Congress has fortified fund directors' oversight responsibilities by adopting § 15(c) of the ICA, requiring directors to be adequately informed of the terms of any investment management contracts.

42.     ICA § 15(c) requires investment advisers to furnish documents and other information in order for fund directors to make informed and independent decisions when evaluating investment advisory contracts; that section also gives directors the authority to demand such information from advisers. *See* 15 U.S.C. § 80a-15(c).

43.     The Artisan Board members are well compensated for their services with an annual fee that is paid quarterly. Prior to April 1, 2011, the Board members were paid an annual

COMPLAINT - 15

fee of $180,000 for overseeing just twelve funds.  Effective April 1, 2011, the fee increased to $200,000.  In addition, the independent chair of the board of directors receives an additional $60,000 annually, and the chairs of the Audit Committee and the Governance and Nominating Committee each receive an additional $30,000 annually.  For the fiscal year ending September 30, 2010,[5] the "independent" Board members received the following compensation from the funds in the Artisan complex:

| | |
|---|---|
| David A. Erne | $235,709 |
| Thomas R. Hefty | $205,618 |
| Jeffrey A. Joerres | $175,527 |
| Patrick S. Pittard | $175,527 |
| Howard B. Witt | $205,618 |

44.   As a result of the compensation they receive, board membership in the Artisan fund complex is a lucrative part-time job for the directors.  Indeed, if the directors meet more than five times in person in a calendar year, they may, in their discretion, pay each director an additional meeting attendance fee above and beyond their base compensation.  Further, the independent directors' continuation in their role from year to year is at least partially dependent on the continued good will and support of the Defendant APLP.

45.   Furthermore, even if statutorily "non-interested," the directors are in all practical respects dominated and unduly influenced by Defendant in reviewing the fees paid by the Funds and their shareholders because all information received by the directors is packaged and presented by Defendant.  In particular, upon information and belief, Defendant does not provide the directors with sufficient, complete, and/or accurate information needed to fulfill their

---

[5] The amount included for the Artisan Global Equity Fund, which commenced operations in March 2010, is an estimate of the amount to be paid for the fiscal year ending September 30, 2011.

COMPLAINT - 16

obligations, a factor demonstrating that the fee setting process lacked good faith and integrity, in violation of ICA § 36(b).

46.     Upon information and belief, Defendant has not provided, and the Board has not considered, adequate information regarding, among other things: the advisory fees charged and services provided by Defendant or its affiliates to other accounts; the economies of scale enjoyed or fallout benefits received by Defendant; and the profitability of the Funds to Defendant (and how to evaluate the profitability data in light of economies of scale).  In fact, as is apparent from the Artisan Funds' public disclosures, Defendant has not provided any meaningful information regarding economies of scale in its costs of providing services to the Funds.

47.     On information and belief, the Board rarely, if ever, questions any information or recommendations provided by Defendant, and Defendant has made misleading representations to the Board, including representations regarding the services Defendant provides to the Funds as compared to the services it provides to other accounts, representations regarding Defendant's economies of scale in providing services to the Funds, and representations regarding Defendant's profitability.

48.     While the evidence needed to establish the truth of these allegations is believed to be exclusively in the control of Defendant and is not in Plaintiff's possession at this time, publicly available documents support the Plaintiffs' allegations.  Here, with one minor exception with respect to the Artisan International Fund, the fee rates charged by Defendants to the Funds have remained the same since the inception of each Fund, notwithstanding dramatic growth in the assets of the Funds and the addition of new funds to the Artisan complex.  More specifically, none of the fee schedules for the Funds contained any breakpoints after $1 billion in assets until the Artisan International Fund received an additional breakpoint at $12 billion in 2005, after its

COMPLAINT - 17

assets exploded past that threshold.  No breakpoints have been instituted for the other Funds on assets over $1 billion even though each of the Funds is well past the $1 billion threshold.  With respect to the International Fund, no breakpoints were instituted on assets between $1 billion and $12 billion or beyond $12 billion.

49.     The foregoing assures that the directors do not have sufficient and accurate information necessary to understand Defendant's true cost structure and, in particular, the economies of scale it enjoys in providing investment advisory services to the Funds.

50.     The Supreme Court held in *Jones* that "a court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance.... Where a board's process for negotiating and reviewing investment adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process. ... In contrast, where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome." *Jones*, 130 S.Ct. at 1429-30.

51.     The fact that the fee rates have, by and large, remained exactly the same since the inception of the Funds is indicative of a lack of negotiation by the board, and therefore a deficient fee setting process, which requires the reviewing court to take "a more rigorous look at the outcome." *Jones*, 130 S. Ct. at 1430.  Furthermore, the deficient fee-setting process resulted in fees that constitute a breach of APLP's fiduciary duty to the Funds with respect to their receipt of compensation.

## C.      COMPARATIVE FEE STRUCTURES CHARGED TO OTHER MUTUAL FUNDS AND NON-MUTUAL FUND CLIENTS FOR SIMILAR INVESTMENT ADVISORY SERVICES

52.     An analysis of the investment advisory fees charged by Defendant to third-party institutional clients, including other mutual funds and non-mutual fund clients, as well as an

analysis of the advisory fees charged by Defendant's competitors to mutual funds comparable to the Artisan Funds, demonstrates that Defendant has charged the Artisan Funds investment advisory fees that violate Defendant's fiduciary duty with respect to the receipt of compensation.

### 1. FEES CHARGED BY DEFENDANT TO INSTITUTIONAL CLIENTS FOR SIMILAR INVESTMENT ADVISORY SERVICES

53. Defendant and/or its affiliated entities also provide investment advisory services to third-party accounts, including other mutual funds and separate accounts.

54. In *Jones*, the Supreme Court indicated that a court should give comparisons between management fees charged to an adviser's mutual funds and management fees charged to its independent clients "the weight that they merit in light of the similarities and differences between the services." 130 S. Ct. at 1428.

55. Upon information and belief, the services that Defendant provides here to the institutional accounts are substantially similar, if not identical, to the investment advisory services Defendant provides to the Artisan Funds. Any additional services provided to the Funds that are not paid for separately are de minimis and cannot account for the fee discrepancy. As a result, a comparison of the investment advisory fees Defendant charges the Funds and the fees Defendant charges its other accounts is entitled to considerable weight.

56. Artisan provides investment advisory services in 12 equity investment strategies through 5 investment teams. There are 12 mutual funds in the Artisan complex. In addition, the Artisan investment teams provide advisory services to 162 separate accounts in the 12 different strategies. These clients include, among others, pension plans, trusts and endowments, government entities, private investment companies, and sub-advised mutual funds. The 12 Artisan funds comprise approximately 54% of the assets managed by Artisan, while the other accounts comprise approximately 46% of the assets managed by Artisan.

COMPLAINT - 19

57.     Artisan admits in its Statement of Additional Information that "client accounts within each strategy, including the Funds' accounts, are managed similarly, substantially all of the research and portfolio management activities conducted by the investment teams benefit all clients within the particular strategy." Jan. 28, 2011 Artisan Funds, Inc. Statement of Additional Information as supplemented May 26, 2011 at 34, available at http://www.artisanfunds.com/materials_info/view_online.cfm.  Indeed, the portfolio managers for the Funds and institutional client accounts are the same, and the top ten holding of the Funds and their institutional account counterparts are not only similar but are exactly the same.  While APLP also claims that its personnel performs significant duties for the Funds that it does not perform for other clients, upon information and belief, those services do not justify the tens of millions of additional dollars (*see infra* ¶ 62) it charges to the Funds' shareholders.

58.     Although the investment advisory services provided to the Funds are virtually identical to services provided to Defendant's other accounts, and therefore are directly comparable, the fees charged to the Funds are materially higher than the fees charged to the other accounts.

59.     While a "manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, ... the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds. The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower." *See* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp. L. 610, at 627-28 (2001) (the "Freeman & Brown Study"), available at http://law.sc.edu/faculty/freeman/jcl-01.pdf.  Indeed, "a mutual fund, as an entity, actually is an

COMPLAINT - 20

institutional investor.  When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest." *Id.* at 629 n.93.  Accordingly, the "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds." *Id.* at 671-72.

60.     The shareholders of the Artisan Funds are plagued by discriminatory over-charging by Defendants.

61.     For example, APLP provides investment advisory services to employee benefit plans, mutual funds, and/or other pooled investments unaffiliated with Artisan, such as the California Public Employees' Retirement System ("CalPERS"), Clearwater Investment Trust, and the Wells Fargo Advantage Diversified International Fund.  Although the investment advisory services that APLP provides these other accounts are the same as the investment management services that APLP provides the Artisan Funds, the Funds, to whom APLP owes a fiduciary duty, pay investment advisory fees that are significantly higher than those paid by the these other clients, who bargain at arm's-length over fees.

   a.     APLP provided domestic equity advisory services to CalPERS from 2001 to 2003 and global equity advisory services from 2004 to 2006.  During these periods, CalPERS paid APLP an advisory fee of approximately 0.06% to 0.10% of the average net assets managed by APLP.

   b.     APLP provides investment advisory services as a subadviser to the Clearwater International Fund, a series of Clearwater Investment Trust.  For those services, APLP receives an annual advisory fee of 0.80% for the first $50 million in net

COMPLAINT - 21

assets managed by APLP, 0.60% for the next $50 million, and 0.50% for all assets in excess of $100 million.

      c.    APLP also provides investment advisory services as a subadviser to the Wells Fargo Advantage Diversified International Fund. For those services, APLP receives an annual advisory fee of 0.80% for the first $50 million in net assets managed by APLP, 0.60% for the next $200 million, and 0.50% for all assets in excess of $250 million.

      62.    Each of the Artisan Funds pays investment advisory fees to APLP that, as a percentage of assets, are close to ten times or more what APLP charged CalPERS and almost double what APLP charges other mutual funds as subadviser. If, for example, the Artisan International Fund, at its current size, were subject to the much more favorable rate charged CalPERS for investment advisory services, it would save at least approximately $63 million in advisory fees annually. And if it were subject to the same rate charged the Clearwater International Fund, it would save approximately $32 million annually.

      63.    That Defendant charges third parties who bargain at arm's-length far lower fees than they are charging the Artisan Funds, to whom they owe a fiduciary duty, for essentially the same services demonstrates that the investment advisory fees charged constitute a breach of Defendant's fiduciary duty to the Funds with respect to such compensation.

    **2.**    **FEES CHARGED TO OTHER MUTUAL FUND COMPLEXES FOR SIMILAR INVESTMENT ADVISORY SERVICES**

      64.    Other investment advisers who offer services to funds similar to the Artisan Funds charge substantially less than Defendant. On information and belief, the services provided by these other advisers are the same or substantially similar to the services that Defendant provides to shareholders of the Artisan Funds.

COMPLAINT - 22

65.     With respect to the Artisan International Fund, in particular, Morningstar has noted that the fund's expense ratio ranks in the highest 40% among no-load foreign large-cap funds, thus earning the fund no credit for its fees in Morningstar's fiduciary grading scheme.

66.     With respect to all of the Funds, the advisory fees Vanguard charges similarly sized, actively managed funds are significantly lower than the advisory fees charged by APLP. In the case of the actively managed Vanguard funds, Vanguard provides all services other than advisory services to the funds at cost, including corporate management, administrative, shareholder servicing, marketing, and distribution expenses. However, the advisory services for the Vanguard funds are negotiated at arm's-length with independent third parties, who profit from the advisory services they perform. As a result, the advisory fees paid by the Vanguard funds represent a fee that bears a reasonable and market based relationship to the services rendered. The table below compares the fees paid by the Artisan Funds with comparable Vanguard funds:

|  | Artisan International Fund | Vanguard International Value Fund | Artisan International Value Fund | Vanguard International Explorer | Artisan Mid Cap Value Fund | Vanguard Selected Value Fund |
|---|---|---|---|---|---|---|
| Morningstar Category | Foreign Large Blend | Foreign Large Value | Foreign Sm./ Mid Value | Foreign Sm./ Mid Growth | Mid-Cap Value | Mid-Cap Value |
| Assets as of 6/15/2011 | $7.6 billion | $7.7 billion | $4.0 billion | $2.8 billion | $7.4 billion | $4.4 billion |
| Advisory Fee | 0.93% | 0.22% | 0.95% | 0.20% | 0.94% | 0.28% |
| Other Expenses | 0.30% | 0.17% | 0.26% | 0.19% | 0.27% | 0.19% |
| Total Exp. Ratio | 1.23% | 0.39% | 1.21% | 0.39% | 1.21% | 0.47% |

COMPLAINT - 23

67.     As the table above illustrates, the overall expenses of the Artisan Funds are significantly higher than those of comparable Vanguard Funds.  It is important to note that the category of Other Expenses for both complexes include, among other things, shareholder services, custodial services, marketing, and distribution.  In the case of the Artisan Funds, these services are provided by third parties for a profit.  In the case of the Vanguard funds, these services are provided by Vanguard at cost or by third parties for a profit.  With respect to the investment advisory services, which account for the bulk of the difference in the total expense ratios between the two complexes, the Artisan Funds pay these fees to APLP, and the Vanguard funds pay these fees to for-profit third parties.  To the extent APLP provides services other than investment advisory services for their advisory fees, these services are de minimis or do not entail significant costs to APLP (*see, supra,* ¶ 34).  Nonetheless, the Artisan Funds pay advisory fee rates that are more than, or close to, quadruple the rates paid by the Vanguard funds.

68.     If the Artisan Funds paid the same advisory fee rates that the Vanguard funds pay, the Artisan Funds, at their current size would save approximately $54 million (International Fund), $30 million (International Value Fund), and $49 million (Mid Cap Value Fund), respectively, on an annual basis.

**D.      WHETHER ECONOMIES OF SCALE WERE PASSED TO THE FUNDS AND THEIR INVESTORS OR KEPT BY THE INVESTMENT ADVISER WITH RESPECT TO INVESTMENT MANAGEMENT SERVICES.**

69.     The size of the compensation received by the adviser should be evaluated in context with the economies of scale realized by the adviser in providing services to a fund.  Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets.  The work required to operate a mutual fund does not increase proportionately with the assets under management.

COMPLAINT - 24

> [I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size. A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion. (Size may impair performance, but it imposes little logistical challenge.)

David F. Swensen, *Unconventional Success: A Fundamental Approach to Personal Investment* 238. Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." *Id.* Indeed, break points "reflect the economic reality of the direct relationship between decreasing marginal costs and increasing portfolio size." *Id.* According to another fund industry expert, John C. Bogle, the economies of scale generated in the mutual fund portfolio management and research business are "little short of staggering." John C. Bogle, *The Battle for the Soul of Capitalism* 154 (2005).

70. As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and a fee of 75 basis points (100 basis points = 1%), the fee equals $375,000 per year. A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand dollars ($3,750,000). Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of ***thirty-seven million, five hundred thousand dollars ($37,500,000) per year.***

71. As assets under management increase, however, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale. In other words, it simply does not cost a fund's adviser ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund. In fact, the investment management services or securities selection process for a ten billion dollar fund and a one billion dollar fund, or even a one million dollar fund, are virtually identical, generating enormous economies of scale. Indeed, at some point, the additional cost to advise

COMPLAINT - 25

each additional dollar in the fund (whether added by a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

72.     The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO"). Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of management services. *See* SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31, available at http://www.sec.gov/news/studies/feestudy.htm; GAO, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9, available at http://www.gao.gov/new.items/gg00126.pdf.

73.     In addition, the most significant academic research undertaken on this issue has proven that economies of scale are not being passed along to mutual fund shareholders — in violation of Defendant's duty to do so under § 36(b). *See* Freeman & Brown Study at 661. The Freeman & Brown Study noted: "The existence of economies of scale has been admitted in SEC filings made by fund managers and is implicit in the industry's frequent use of fee rates that decrease as assets under management increase. Fund industry investment managers are prone to cite economies of scale as justification for business combinations." *Id.* at 620.

74.     Economies of scale exist not only fund by fund but also exist with respect to an entire fund complex and even with respect to an investment adviser's entire scope of operations, including services provided to institutional and other clients. *See* Freeman & Brown Study at 621 n.62 (quoting Victoria E. Schonfeld & Thomas M.J. Kerwin, Organization of a Mutual Fund, 49 Bus. Law 107 (1993)).

COMPLAINT - 26

75.     In the case of the Artisan Funds, as assets under management have grown, so have the management fees paid to Defendant, despite the economies of scale realized by Defendant. Although significant economies of scale exist with respect to Defendant's provision of investment advisory services to the Artisan Funds, they largely have been appropriated for the benefit of Defendant. The economies of scale benefits that have been captured and misappropriated by Defendant can and do generate huge unreasonable and excessive profits for Defendant in breach of its fiduciary duty to the Funds with respect to such compensation. These benefits could be shared with the mutual funds and their shareholders by reducing the management fees and other costs charged to the Funds by Defendant. However, in the case of the Artisan Funds, no meaningful savings have been shared with the Funds.

76.     In contrast to the Artisan Funds, Defendant's other clients receive substantial economies-of-scale benefits. For example, Defendant has negotiated a fee schedule with the Clearwater International Fund that contains two substantial breakpoints, one at $50 million in assets and one at $100 million in assets (*see, supra,* ¶ 61.b.). In contrast, the fee schedule for the International Fund contains only slight breakpoints, and these do not even *begin* until the Fund reaches $500 million in assets and re-occur at vastly increased asset levels (*see, supra,* ¶ 32).

77.     As a result, Defendant fails to meaningfully share with the shareholders of the Artisan Funds the benefits of economies of scale realized from providing investment advisory services to the Funds, and the fees charged to the Funds fail to share these economies in the same relationship that these same economies are shared with market driven institutional accounts.

78.     Given that the fees paid to Defendant are unfair, unreasonable, and excessive, especially when compared to the rates charged by Defendant to other clients, the excess profits resulting from these economies of scale belong to Plaintiff and the other shareholders of the

COMPLAINT - 27

Artisan Funds. Nevertheless, the economies of scale enjoyed by Defendant with respect to the Funds have not been adequately shared with the Funds, as required by § 36(b), in breach of Defendant's fiduciary duty to the Funds with respect to such compensation.

**E.    COSTS AND PROFITABILITY OF PROVIDING INVESTMENT MANAGEMENT SERVICES**

79.    "[T]he 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its advisor be equivalent to 'the product of arm's-length bargaining.'" *See* the "Freeman & Brown Study" at 661. The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services. However, on information and belief, Defendant's reporting of its revenue and costs to the Funds' directors is intended to, and does, obfuscate Defendant's true profitability. For instance, on information and belief, Defendant employs inaccurate accounting practices in its financial reporting, including arbitrary and unreasonable cost allocations.

80.    Following discovery of this information, Defendant's true profitability can be determined on either an incremental basis or a full-cost basis. Defendant's incremental costs of providing management services to Plaintiff are believed to be nominal while the additional fees received by Defendant are unreasonable and excessive given that the nature, quality, and level of the services remain the same in breach of Defendant's fiduciary duty to the Funds with respect to such compensation. On information and belief, a review of Defendant's full costs of providing management services will also demonstrate the enormous profitability to Defendant of managing the Artisan Funds.

81.    While the evidence needed to establish the truth of the foregoing allegations is believed to be exclusively in the control of Defendants and is not in Plaintiff's possession at this

COMPLAINT - 28

time, even the limited publicly available information disclosed by Defendant provides insight into its profitability vis-à-vis the Artisan Funds.

82.     Based on data made available in Artisan's recent S-1 Registration Statement,[6] while the 12 mutual funds managed by Artisan have accounted for just slightly more than half (54%) of Artisan's assets under management over the past three years, those funds have accounted for more than two-thirds of Artisan's revenues. This is driven by Artisan's discriminatory pricing of advisory services for the Funds vis-à-vis the separate accounts. On whole during this period, Artisan has collected approximately double the fee rate (as a percentage of assets) from the Funds (to whom it owes a statutory fiduciary duty) as it has from the separate accounts (to whom it does not owe a statutory fiduciary duty). In addition, the data, taking into account a reasonable allocation of expenses, illustrates that Artisan has generated a profit margin on the Funds that is approximately double the margin it has generated on the separate accounts.

## COUNT I

### (VIOLATION OF ICA § 36(b))

83.     Plaintiff repeats and realleges each and every allegation contained prior to Count I as if fully set forth herein.

84.     This Count is brought by Plaintiff on behalf of and for the benefit of the Artisan Funds against the Defendant for breach of its fiduciary duties with respect to the receipt of compensation as defined by § 36(b).

---

[6] Available at http://www.faqs.org/sec-filings/110517/Artisan-Partners-Asset-Management-Inc_S-1.A/.

COMPLAINT - 29

85.   The Defendant has a fiduciary duty to the Artisan Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to such Defendant.

86.   The fees charged by Defendant for providing investment advisory services to the Funds breach Defendant's fiduciary duty to the Funds with respect to such compensation.

87.   By reason of the conduct described above, Defendant violated § 36(b) of the ICA. As a direct, proximate and foreseeable result of Defendant's breaches of fiduciary duties in its role as investment adviser to the Artisan Funds and their investors, the Artisan Funds and their shareholders have sustained many millions of dollars in damages.

88.   In charging and receiving inappropriate and unlawful compensation, and in failing to put the interests of the Plaintiff, and other shareholders of the Funds ahead of its own interests, Defendant has breached and continues to breach its statutory fiduciary duty to Plaintiff in violation of § 36(b).

89.   The Plaintiff seeks, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendant, up to and including, "the amount of compensation or payments received from" the Funds.

90.   Alternatively, the Plaintiff seeks rescission of the contracts and restitution of all fees paid pursuant thereto. *See* 15 U.S.C. §80a-46(a-b) of the ICA.  When a violation of the ICA has occurred, a court may order that the Investment Advisory Agreements between the Defendant and the Artisan Funds on behalf of the Artisan Funds be rescinded, thereby requiring restitution of all investment management fees paid to it by the Artisan Funds from one year prior to the commencement of this action through the date of trial, together with interest, costs,

COMPLAINT - 30

disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

**WHEREFORE**, Plaintiff demands judgment as follows:

(1)     An order declaring that Defendant has violated and continues to violate ICA § 36(b) through the receipt of fees from the Artisan Funds that breach Defendant's fiduciary duty with respect to the reception of compensation.

(2)     An order preliminarily and permanently enjoining Defendant from further violations of the Investment Company Act.

(3)     An order awarding compensatory damages on behalf of the Artisan Funds against Defendant, including repayment of all unlawful fees paid to it by the Artisan Funds or their security holders from one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law. Plaintiff reserves the right to seek punitive damages where applicable.

(4)     An order rescinding the several investment advisory agreements between the Defendant and the Artisan Funds, pursuant to 15 U.S.C.§ 80a-46(b), including restitution of all investment advisory fees paid to it by the Artisan Funds from a period commencing one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.

(5)     Such other and further relief as may be just and proper under the circumstances.

## VI.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

1    DATED this 23 day of June, 2011.

2                                         **KELLER ROHRBACK L.L.P.**

3

4                                         By _____

5                                         Sharon T. Hritz (CA Bar No. 265105)
                                          Email: shritz@kellerrohrback.com
6                                         1129 State Street, Suite 8
                                          Santa Barbara, CA 93101
7                                         Tel: (805) 456-1496
                                          Fax: (805) 456-1497
8

9                                         **KELLER ROHRBACK L.L.P.**
                                          Lynn Lincoln Sarko
10                                        Email: lsarko@kellerrohrback.com
                                          Michael D. Woerner
11                                        Email: mwoerner@kellerrohrack.com
                                          Tana Lin
12                                        Email: tlin@kellerrohrback.com
                                          Laura R. Gerber
13                                        Email: lgerber@kellerrohrback.com
                                          1201 Third Avenue, Suite 3200
14                                        Seattle, WA 98101
                                          Tel: (206) 623-1900
15                                        Fax: (206) 623 3384
16

17                                        **JOHNSON, POPE, BOKOR, RUPPEL &**
                                          **BURNS, LLP**
18                                        Guy M. Burns, FBN 0160901
                                          Email: guyb@jpfirm.com
19                                        Jonathan S. Coleman, FBN 0797480
                                          Email: jonathanc@jpfirm.com
20                                        Aleksas A. Barauskas, FBN 68175
                                          Email: aleksasb@jpfirm.com
21                                        403 E. Madison Street, Suite 400
                                          Tampa, FL 33602
22                                        Tel: (813) 225-2500
                                          Fax: (813) 223-7118
23

24

25

26

27

28

COMPLAINT - 32

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
Michael Brickman
Email: mbrickman@rpwb.com
James C. Bradley
Email: jbradley@rpwb.com
Nina H. Fields
nfields@rpwb.com
174 E. Bay St.
Charleston. SC 29401

**KENNER SCHMITT NYGAARD, LLC**
Diane A. Nygaard
Email: diane@nygaardlaw.com
117 West 20th Street, Suite 201
Kansas City, MO 64108
Tel: (913) 469-5544
Fax: (913) 469-1561

*Attorneys for Plaintiff*

COMPLAINT - 33